Argued July 1, 1963, reversed January 29, petition for rehearing denied April 28, certiorari denied, United States Supreme Court October 23, 1964

## DAY *v.* NORTHWEST DIVISION 1055 ET AL

389 P. 2d 42

*Paul T. Bailey,* Portland, argued the cause for appellants. With him on the briefs were Bailey, Swink & Gates and Harl H. Hass, Portland.

*Maurice Sussman,* Portland, argued the cause for respondent. With him on the brief were Sussman & Sussman, Portland.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Lusk, Justices.

SLOAN, J.

Plaintiff Day was employed as a driver by Western Greyhound Lines. His employment was governed by a contract between Greyhound and defendant local union Northwest Division 1055. Amongst other things this contract required Day to remain a member of the union in good standing in order to retain his employment. On November 3, 1959, Day's employment was terminated by Greyhound at the request of the individually named defendant, Bankhead. The latter was financial secretary of the union. The ostensible cause of Bankhead's request that Day's employment be terminated was the failure of Day to pay his union dues on time. There was evidence to show, and the jury found, that the real cause was a conspiracy to get Day out of the union. Day brought this action for tortious interference with his employment and received a large jury verdict for general and punitive damages. Defendants union and Bankhead appeal.

Other defendants were originally named; we need not consider them. They have been removed from the case. Other detailed facts could be stated. This is unnecessary. The basis of our determination of the case is two recent decisions of the United States Supreme Court on the subject of federal pre-emption of disputes like the instant case. These cases, *Association of Journeymen v. Borden,* 373 US 690, 83 S Ct 1423, 10 L Ed2d 638, and *Iron Workers Union v. Perko,* 373 US 701, 83 S Ct 1429, 10 L Ed2d 646, were both decided on June 3, 1963. Unfortunately these decisions were filed after the pre-emption issue was decided on a pleading's issue by the trial court and after briefs were filed by the parties here.

Our study of these and other cases and authority have caused us to conclude that *Borden* and *Perko*

limit plaintiff's relief here to the National Labor Relations Board. The earlier case of *Machinists v. Gonzales,* 1958, 356 US 617, 78 S Ct 923, 2 L Ed2d 1018, which gave support to plaintiff's claim here has now been substantially modified, if not overruled, by later cases. The first case after *Gonzales* to further restrict the jurisdiction of the state courts was *San Diego Unions v. Garmon,* 1959, 359 US 236, 79 S Ct 773, 3 L Ed2d 775. The *Garmon* decision caused the Second District, Division One of the California Court of Appeals in *Fullerton v. International Sound Technicians, Etc.,* 1961, 194 CA2d 801, 15 Cal Rptr 451, by an extensive opinion, to conclude that federal authority had pre-empted all cases of the kind now before us. And in *Perko* the Court stated at 373 US 705 that:

> "At the outset we note that for the reasons set forth in *Borden, ante,* p. 690, the rationale of the *Gonzales* case does not support state jurisdiction here, and we need not now consider the present vitality of that rationale in the light of more recent decisions."

The dissenting opinion in the *Borden* case provides strong emphasis that *Gonzales* can no longer be held to support state jurisdictions in the instant and other like cases.

It is true that in *United Workers v. Laburnum Corp.,* 1954, 347 US 656, 74 S Ct 833, 98 L Ed 1025, followed later by *Automobile Workers v. Russell,* 1958, 356 US 634, 78 S Ct 932, 2 L Ed2d 1030, the Court sustained recovery in state courts for damages in tort. But in the later case of *Garmon,* supra, at 359 US 236, 247, the *Laburnum Construction Corporation* and *Russell* cases were limited to torts by violence which created a "compelling state interest" to maintain domestic peace.

We learn from cases like *National Lab. Rel. Bd. v. Technicolor Motion Pic. Corp.*, (9th Cir USCA, 1957), 248 F2d 348, and *International Union of Electrical, R. & M. Wkrs. v. N.L.R.B.*, (USCA-DC 1962), 307 F2d 679, that a union may lawfully require an employer to discharge an employe for a failure to maintain good standing in the union, when the union contract permits it, as in the instant case. If the request for discharge has been honest and for the actual reason assigned, the union and employer are within their rights and it is held that no unfair labor practice has occurred. But, if the discharge for failure to pay dues was used as a subterfuge to hide some other improper motive, as in the instant case, the union, at least, has been guilty of an unfair labor practice and the National Labor Relations Board will, presumably, protect the workman's rights. The cases leave no doubt that the decision as to the true nature of the discharge is within the cognizance of the Board.

*Garmon,* supra, *Borden* and *Perko* all tell us that if the conduct alleged "may reasonably be asserted to be subject to Labor Board's cognizance," then the courts, both state and federal, are without any right to proceed. In this case the Board does reasonably have cognizance of the question at issue and we must desist from further proceedings.

We have no hesitancy in stating that we reach that conclusion with reluctance. However, the result has been fortified by *Retail Clerks Internat'l Ass'n, Local 1625 v. Schermerhorn,* decided December 2, 1963, 84 S Ct 219, 223, 11 L Ed2d 179, 185, wherein the Court made this reference to the *Borden* and *Perko* cases:

"We held in Plumbers' Union v. Borden, 373 US 690, 10 L ed 2d 638, 83 S Ct 1423, and in Iron

Workers v Perko, 373 US 701, 10 L ed 2d 646, 83 S Ct 1429, that Garmon preempted the field where employees were suing unions for damages arising out of practices that arguably were unfair labor practices subject to regulation by the National Labor Relations Board. * * *."

It follows that the action must be dismissed.

PERRY, J., dissenting.

The majority fail to set forth the facts which are necessary to determine this case, so I shall do so.

The material facts in this case are that plaintiff Day was a member of the defendant Local 1055, a labor union; that he was employed as a bus driver by the Greyhound Corporation, a corporation engaged in interstate commerce. The union had a union-shop agreement with Greyhound. A check-off system for the payment of dues was inaugurated by the officers of the union and acquiesced in by Greyhound. A number of the employees, among them this plaintiff, protested the deduction of dues from pay checks because they had not signed authorization cards, and thereafter plaintiff received his pay check without the deduction. This change required the plaintiff to pay his dues directly to the union.

After this change was made in the method of the payment of dues, the defendant Bankhead, as financial secretary of the union in charge of collection of membership dues, wrote a letter to plaintiff, advising him that he was delinquent in the payment of his September dues, but would be allowed until October 28, 1959, to make this payment, or be suspended.

Plaintiff, on October 27, 1959, went to the union office and paid his September dues. At this time, Bankhead advised plaintiff that his October dues were

owing and must be paid by October 31, 1959. Bankhead then determined the defendant was no longer a member of the union. On November 2 Bankhead notified Greyhound to discharge plaintiff, as he had suspended himself from membership in the union and was, therefore, no longer a member in good standing as required under the union-shop agreement.

Pursuant to Bankhead's notification, Greyhound on November 4 notified plaintiff that he was discharged. The morning of November 5 the amount of the dues, $14.00, was received by defendant for plaintiff's October and November dues. This money had been placed in the mails on November 3, one day before his discharge by his employer. The tender of dues was then rejected by the union on the basis that at the time the tender was received the plaintiff was not then employed as a bus driver or in any activity or industry over which the union exercised jurisdiction.

On November 12, on an approved form, plaintiff filed a "charge" against the union, alleging it had engaged in an unfair labor practice "within the meaning of Section 8(b) subsections 1 and 2 of the National Labor Relations Act, * * * affecting commerce * * *," as follows:

"The above labor organization successfully and unlawfully demanded my discharge by the employer named below for the reason of delinquency in dues. I was notified by the Company's chief dispatcher at about 6:00 P.M. on November 4, 1959, that I was discharged. On November 3, 1959, by deposit in the mails, addressed to the Union, I tendered my dues payment for October and November, 1959, and the dues payment was in possession of the Union prior to my discharge."

On December 15 the plaintiff received the following notice from the Regional Director:

"The above-captioned cases charging violations under Section 8 of the National Labor Relations Act, as amended, have been carefully investigated and considered.

"As a result of the investigation, it appears that, because there is insufficient evidence of violations, further proceedings are not warranted at this time. I am therefore refusing to issue Complaint in these matters.

"Pursuant to the National Labor Relations Board Rules and Regulations (Section 102.19), you may obtain a review of this action by filing a request for such review with the General Counsel of the National Labor Relations Board, Washington 25, D.C., and a copy with me. This request must contain a complete statement setting forth the facts and reasons upon which it is based. The request must be received by the General Counsel in Washington, D.C., by the close of business on December 28, 1959. Upon good cause shown, however, the General Counsel may grant special permission for a longer period within which to file."

The Regional Director states he has carefully investigated the plaintiff's complaint and there is not sufficient evidence "at this time" to prosecute the complaint. It should be noted that all of the evidence offered in this case was available at the time the complaint was filed. The plaintiff made no attempt to obtain a review of the findings and decision of the Regional Director, and the decision of the Regional Director thus became final.

There is some evidence that on occasion other union members had been late in the payment of dues, but they were not dropped from membership if the

dues were later tendered. There is also evidence that plaintiff had objected to the check-off system. The union rules in relation to the late payment of dues provide as follows:

"All dues, fines and assessments of the members of this Association are due and payable on the first day of each month for that month, and all moneys owed the Association by a member shall be considered as dues and come under the same terms for collection of dues, unless other arrangements are made. They must be paid by the fifteenth of the month in order to continue the member in good standing. The member on paying his dues, shall receive from the F. S. a working card as a receipt, which is evidence of his standing in the L.D. A member in arrears for his dues, fines and assessments after the fifteenth day of the month is not in good standing and not entitled to sick, disability or funeral benefits, or to the protection of the Association, in any manner whatsoever, and where a member allows his arrearage in dues, fines and assessments to run into the second month before paying the same, he shall be debarred from benefits for one month after payment. *Where a member allows his arrearage for dues, fines and assessments to run over the last day of the second month without payment, he does thereby suspend himself from membership in this Association, and the fact that the member is not in possession of his monthly working card is due notice to him of his suspension from membership and no further notice will be necessary.* Where agreements with employing companies provide that members must be in continuous good financial standing, the member in arrears one month may be suspended from membership and removed from employment, in compliance with terms of the agreement." Constitution and General Laws, Amalgamated Association of Street, Electric Railway and Motor Coach Employes of America, Section 91. (Emphasis ours.)

The agreement between Greyhound and the union insofar as applicable is as follows:

> "*All employees within the scope of this Agreement shall become members of the Association and remain members in good standing* as a condition precedent to continued employment with the Company. Any new employees within the scope of this Agreement shall thirty (30) days from the date of their employment become members of the Association and shall thereafter remain members in good standing as a condition precedent to continued employment with the Company." Section 11, Union Membership. (Emphasis ours.)

The plaintiff in his complaint alleges:

"VIII

"* * * defendant Amalgamated Association and component unions, including defendant Northwest Division 1055, entered *into a collective bargaining agreement* with defendant Greyhound Corporation for employees of defendant Northwest Division 1055 who were working for Greyhound, including plaintiff Elmer J. Day; that Greyhound Corporation recognizes defendant Amalgamated Association and defendant Northwest Division 1055 as the representative of those employees.

"IX

"Alleges that plaintiff Elmer J. Day was and now is a member of defendant Northwest Division 1055 and an employee of Greyhound Corporation and that plaintiff Day had six years seniority and therefore had acquired seniority rights and benefits.

"X

"That Greyhound Corporation and defendant Northwest Division 1055 utilized 'Check Off' system for deduction of plaintiff's union dues from his wages; that on October 9, 1959, plaintiff and other members of Northwest Division 1055 notified

defendant Greyhound Corporation that the Check Off practice was unlawful and requested it to be discontinued.

## "XI

"That said action of plaintiff and other employees in objecting to the unlawful use of the Check Off practice displeased all of the defendants named in this action, and disrupted the uniform application of the Check Off to all employees of defendant Greyhound Corporation who were members of defendant Northwest Division 1055 and defendant Amalgamated Association and caused ill will to be generated toward plaintiff by said defendants and the individual defendants who conducted the affairs of said defendant unions; that all of said defendants including the individual defendants, Charles C. McCaffery, Floyd L. Johnson, C. A. Bankhead and William J. Lever, who conducted the affairs of said unions in the territory of the defendant Northwest Division 1055, as representatives of the defendant unions and in their individual capacity desired to continue said unlawful practice and to continue to apply the Check Off to all members of said unions so as to maintain the control of defendant Northwest Division 1055 in said individual defendants, and said individual defendants desired the continuation of said unlawful practice and its application to all members of defendant Northwest Division 1055 for their own gain in maintaining their own individual positions in said union, and for other unlawful purposes in violation of the trust imposed upon them in their official capacities as representatives of the members of said union.

"*   *   *   *   *

## "XIII

"That subsequent to October 9, 1959, and prior to November 5, 1959, for the purpose of requiring all employees of defendant Greyhound Corporation

who were members of Northwest Division 1055 to consent to and execute authorizations for deduction of payment of monthly union dues payable to defendant Northwest Division 1055 so that the Check Off would be applied to all of said employees, and for the purpose of coercing and intimidating all said employees to sign such authorizations for application of the Check Off, and to coerce and intimidate any of such employees from lawfully withdrawing any existing lawful authorization of the Check Off, all of the defendants named in this action, including the individual defendants acting in their individual capacities, as well as representatives of said unions, conspired, determined and agreed to make an example of the plaintiff and for said illegal and unlawful purposes and in furtherance of said conspiracy *had him taken out of service so he could not work for his employer,* and discriminated against plaintiff as a member of defendant Northwest Division 1055 and have suspended him from said union depriving him of his rights as a member of said union.

### "XIV

"That by reason of said wrongful and unlawful acts of the defendants, and each of them, the plaintiff has been prevented from following his employment and earning a living for himself and family and from continuing in the employment for which he has been especially trained and is experienced in, and plaintiff has been deprived of all the benefits from said employment with defendant Greyhound Corporation that have accrued to him by reason of his seniority and experience, and plaintiff has been deprived of all the rights and benefits to which he is and would be entitled to in the future from his membership in defendant Northwest Division 1055, and plaintiff has been harrassed and subjected to mental anguish all to plaintiff's damages in the sum of $100,000.00.

"* * * * *" (Emphasis ours.)

Based upon a finding that plaintiff was discharged from his employment, not because of failure to pay dues, but because the union officers disliked his attitude, the jury returned a verdict for the plaintiff.

The defendants having questioned the jurisdiction of the state courts, the primary question that must be answered is whether the National Labor Management Relations Act of 1947, as amended, has granted the National Labor Relations Board exclusive jurisdiction of the issues presented under the facts of this case. Whether or not exclusive jurisdiction to determine the issues presented herein lie with the National Labor Relations Board depends upon the congressional intention as expressed in the Act.

The Act provides:

"It shall be unfair labor practice for an employer—

"* * * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8 (a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9 (e) within one year

preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) *if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership*;

"* * * * *

"(5) * * * * *

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground *other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership*;

"* * * * *" National Labor Relations Act,

Unfair Labor Practices, Section 8; 29 USCA 257, Unfair Labor Practices § 158. (Emphasis ours.)

The fact alone that an Act is an unfair labor practice is not the test of the Labor Board's exclusive jurisdiction in all cases. The Act provides, and the Supreme Court of the United States has stated, "the authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301." *Smith v. Evening News Association,* 371 US 195, 83 S Ct 267, 269, 9 L Ed2d 246.

In *Smith v. Evening News Association,* supra, Smith, an employee of the Evening News, sued this employer on behalf of himself and others for damages for breach of a collective bargaining contract entered into between the union and the association. The action was filed in the Circuit Court of Wayne County, Michigan. We quote:

"The trial court sustained respondent's motion to dismiss for want of jurisdiction on the ground that the allegations, if true, would make out an unfair labor practice under the National Labor Relations Act and hence the subject matter was within the exclusive jurisdiction of the National Labor Relations Board. The Michigan Supreme Court affirmed, 362 Mich. 350, 106 N.W.2d 785, relying upon San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775, and like pre-emption cases. Certiorari was granted, 369 U.S. 827, 82 S. Ct. 843, 7 L. Ed. 2d 793, after the decisions of this Court in Local 174, Teamsters, etc. v. Lucas Flour Co., 369 U.S. 95, 82 S. Ct. 571, 7 L. Ed. 2d 593, and Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S. Ct. 519, 7 L. Ed. 2d 483." 83 S Ct 267 at 268, 371 US 195 at 196.

Section 301 reads as follows:

> "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." Labor Management Relations Act, § 301 (a); 29 USCA § 185(a).

It will be noted that the language of the Act does not mention the right of an individual to sue for his injuries, but, as stated by the court in *Smith v. Evening News Association,* supra, § 301 "is not to be given a narrow reading." 83 S Ct 267 at 270. Also, as in this matter before us, a member of a union may sue the union of which he is a member in the state courts for causing a breach of the bargaining agreement between the employer and the union. *Humphrey v. Moore,* Nos. 17 and 18 US S Ct, January 6, 1964; 32 LW 4055.

A bargaining agreement entered into by the union is for the benefit of both the employees and the employer, and in the matter before us we must assume the union shop clause was considered beneficial to both. It appears from the allegations of plaintiff's complaint that defendants did cause a breach of the bargaining agreement. Therefore, the courts of this state have concurrent jurisdiction with that of the National Labor Board to determine and adjudicate the issues here presented.

If, on the other hand, the suit of the plaintiff is treated entirely on the basis of tortious conduct, sepa-

rate and apart from § 301 of the Act, I reach the same result.

Without analysis of the basis upon which *San Diego Bldg. Trades Council v. Garmon,* 359 US 236, 79 S Ct 773, 3 L Ed2d 775, *Association of Journeymen v. Borden,* 373 US 690, 83 S Ct 1423, 10 L Ed2d 638, and *Iron Workers Union v. Perko,* 373 US 701, 83 S Ct 1429, 10 L Ed2d 646, as modified by the 1959 amendments to the Act, rest, the majority hold the underlying legal principles set forth in those cases control the issues in the matter before us.

Those cases demonstrate that, where a policy issue is presented, the National Labor Relations Board shall first decide the policy issue, and until decided all courts are denied the primary right of adjudication.

An examination of each of these cases discloses that the word ''arguably'' was used by the Court in the primary sense as a word of art, to describe the existence of an uncertainty as to whether an act or practice, not specifically defined in the Act, engaged in by one of the disputing parties would be protected or not protected within the policy intent of the Act.

"Arguably" as used in the primary sense in Garmon discloses uncertainty existed as to whether or not, under the circumstances existing, peaceful picketing of the premises of defendant Garmon by the union was prohibited or permitted under the Act.

In Borden, the uncertainty existed as to whether the union had a right under the Act to refuse to recommend a member for certain employment who refused to abide by a union rule which might or might not be recognized by the Board as a proper protected concerted activity of the union within the meaning of § 7.

In Perko, the uncertainty existed, first, as to the

status of Perko as a foreman or general employee. This question, it was held, is one "of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole." *Marine Engineers Beneficial Assn. v. Interlake Steamship Co.,* 370 US 173, 180. And, second, that Perko's discharge by his employer caused by the union was due to Perko's violation of a union rule that may or may not have been a protected rule under the Act.

Certainly, where an agency has been designated to primarily determine whether an act or practice is authorized or protected within the framework of an Act, no court would be in a position to determine whether or not a person was injured by a claimed wrongful act of another until the law had previously determined that the claimed act, if proven, was wrongful.

That "uncertainty" as to whether an act or practice would be protected or not is the basic reason for the use of the word "arguably" is born out by the language of the Supreme Court of the United States in *Retail Clerks International Association, Local 1625, v. Schermerhorn,* 83 S Ct 1461, 1466, 10 L Ed2d 678, 684:

"It is first urged that whether or not a particular union security contract is within the category subjected to state law by § 14(b) is a matter for the Board and no business of the state courts, at least in the doubtful cases where the coverage of § 14(b) is not a clearly settled matter. If a contract is not within § 14(b), the argument goes, it is protected by federal law. If within § 14(b), the arrangement is an unfair practice, at least arguably so. Therefore, *where the status of a contract for the purposes of § 14 (b) is at all doubtful, the Board is assertedly the tribunal to deal with the question.* Although we were asked in the petition for cer-

tiorari, and again in petitioners' brief for oral argument to resolve the § 14(b) issue in this agency shop case, the clear thrust of this phase of petitioners' preemption argument is that neither the Florida courts nor this Court should purport in the first instance to determine the status of an agency shop contract under § 14(b).

"There is much force in the argument that the assessment of any union security arrangement for the purposes of §§ 7, 8 and 14(b), when there is significant doubt about the matter, is initially a task for the Board, so that it may finally come to this Court with the benefit of the effected agency's views, and in all probability the preemption issue was entitled to different treatment than it received in the Florida courts at the time this case was decided. *But what was then an arguable matter under § 14(b) is not necessarily arguable now. In the first place, as we have held in General Motors Case, an agency shop arrangement is the equivalent of a permitted § 8(a) (3) membership agreement, a result which rules this case since, as we have indicated, § 14(b) subjects to state law the membership agreements, or their equivalent, which are permitted by § 8(a) (3).* Secondly, the Board's brief in the General Motors Case contained the Board's own view of the status of the agency shop agreement under § 14(b): the provision conditioning employment upon the payment of sums equal to initiation fees and monthly dues is within the § 8(a) (3) proviso, within the scope of § 14(b), and hence subject to invalidation by state law. *What was an arguable question of § 8(a) (3) and § 14(b) coverage has been settled, not only in the light of, but consistently with, the views of the Board.* We see no reason to hold our hand at this juncture in order that the Board may arrive again at what is now a foregone conclusion. Cf. Federal Maritime Board v. Isbrandtsen Co. 356 US 481. 2 L ed 2d 926, 78 S Ct 851." (Emphasis ours)

It is also true, there is language in Garmon to the effect that if the act or practice is "arguably" one specifically prohibited by the Act, then the National Labor Relations Board alone has sole power to primarily adjudicate the issue. The basis for the use of the word "arguably" in this sense, later as argued by the Supreme Court, lies in the finding of a congressional intent that to effectuate the purposes of the Act, uniformity of remedy is required.

If the gist of plaintiff's action is in damages for tortious dismissal from the union, then, since the 1959 amendment to the Act, the requirement of uniformity of remedy cannot be inferred as the Act provides that any state remedies previously available to a wronged union member by his union remain available.

Section 603(a) of the Labor Management Reporting and Disclosure Act of 1959 provides as follows:

"* * * except as explicitly provided to the contrary, nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such Federal law or law of any State."

Prior to the enactment of the Reporting Act the Supreme Court of the United States had held in *Automobile Workers v. Russell,* 356 US 634, 78 S Ct 932, 2 L Ed2d 1030, and in *United Workers v. Laburnum Corp.,* 347 US 656, 74 S Ct 833, 98 L Ed 1025, that an injured party was not required to forego his common-law remedy in the state courts, even though a remedy was provided the injured party under the National Labor Relations Act.

In *Machinists v. Gonzales,* 356 US 617, 78 S Ct 923, 2 L Ed2d 1018, the Court, following the rationale of Russell and Laburnum as to conflict of remedies,

held that, where there was only partial relief available through the Board, there was no great danger of conflict with the federal policy by reason of the different remedies, and the states were, therefore, at liberty in such circumstances to resolve all the issues.

It seems clear to me from the above language of this Act that, insofar as the individual members of a labor organization are concerned, in those instances where they suffer from the tortious acts of a union, Congress intended to set aside the Garmon restrictions and return to the doctrine expressed by the Court in Russell, Laburnum and Gonzales.

To accept the hypothesis of the majority is to argue that Congress intended in those matters affecting the individual workman that uniformity of remedy should require exclusive federal jurisdiction even to the denial of all remedy.

It was to prevent the perpetuation of a remediless no-man's-land in conflicts between organized labor and management under the doctrine of *Guss v. Utah Labor Board,* 353 US 1, 77 S Ct 598, 1 L Ed2d 601, that Congress amended the National Labor Relations Act as follows:

> "The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to the Administrative Procedure Act, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction; Provided, That the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.
>
> "Nothing in this subchapter shall be deemed to

prevent or bar any agency or the courts of any State or Territory (including the Commonwealth of Puerto Rico, Guam, and the Virgin Islands), from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction." National Labor Relations Act, 29 USCA § 164(c) (1) and (2).

This 1959 amendment to the Act does not specifically require the application of federal law in those cases where the Board declines jurisdiction, and it is quite clear that Congress in passing this Act rejected the idea that uniformity of remedy was an essential policy requirement as to all phases of the Act.①

Certainly Congress, while providing remedial legislation to alleviate the intolerable no-man's-land for labor and management, ought not be accused of intending to create a no-man's-land for the individual workman. Nevertheless, the opinion of the majority creates that very situation and condemns its authors.

The plaintiff filed a complaint with an officer of the National Labor Relations Board, stating he had been discharged by his employer on a false claim by the union that he was delinquent in his dues. The officer of the Board refused to file a complaint with the Board.

Section 3(d) of the Act provides that the General Council of the Board shall have final authority as to "the issuance of complaints * * * before the Board." It also provides that the General Council shall have authority over the "officers in the regional offices." This section of the Act has been construed to deny

---

① Congress rejected the "Prouty Amendment" (105 Cong. Rec. 5949 [daily ed., April 24, 1959]) which would have required the states to apply Federal law.

the right of the Board to adjudicate a claimed unfair labor practice until the General Council, or someone authorized by him, has issued a complaint. *Hourihan v. National Labor Relations Board,* 201 F2d 187, 91 US App 316; *Haleston Drug Stores v. National Labor Relations Board,* 187 F2d 418, cert. denied, 342 US 815. Thus it would appear that in those instances, as here, where there is a claim that an unfair labor practice has been committed, and the Regional Director refuses to issue a complaint, it is possible that no forum exists for an adjudication that could make the injured workman whole.

If, therefore, the courts are without jurisdiction, the injured workman is denied damages for his injury. In my opinion, the congressional reason for enacting the quoted portion of § 603(a) when amending the Act in 1959, was to prevent this very injustice.

While it may be contended by some that the use of the word "law" should be restricted to acts passed by the state's legislative body, no such restrictive interpretation should be indulged in. The Act is remedial and should be liberally construed to give the workman his prior rights under the recognized law of a state.

For the foregoing reason, I would affirm the judgment of the trial court.

Rossman, J., concurs in this dissent.