460 P.2d 719 (1969)
93 Idaho 294
Wilson P. LOCKRIDGE, Plaintiff-Respondent Cross-Appellant,
v.
AMALGAMATED ASSOCIATION OF STREET, ELECTRIC RAILWAY AND MOTOR COACH EMPLOYEES OF AMERICA, an International Labor Union, and Northwest Division 1055 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, a regional division of the International Union, Defendants-Appellants.
No. 9959.
Supreme Court of Idaho.
October 15, 1969.
*720 McClenahan & Greenfield, Boise, Earle W. Putnam, Cole & Groner, Washington, D.C., Bailey, Swink, Haas, & Malm and Seagraves & Lansing, Portland, Or., for appellant.
Anderson, Kaufman, Anderson & Ringert, Boise, for respondents.
SPEAR, Justice.
This is the second appearance of this cause before this court. See Lockridge v. Amalgamated Ass'n of St. El. Ry. & M.C. Emp., 84 Idaho 201, 369 P.2d 1006 (1962). The issue presented is the same: "Does the National Labor Relations Act pre-empt state court jurisdiction over the question of whether a union member has been improperly expelled from membership in the union for alleged non-payment of dues in violation of the contractual relationship between the two?" Appellant union urges that seven decisions subsequent to the previous Lockridge decision require reversal of that decision. Appellant points particularly to Local 100 of United Ass'n of Journeymen & Apprentices v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963); Local No. 207, International Ass'n etc. Iron Workers v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963); Cox's Food Center, Inc. v. Retail Clerks U. Loc. No. 1653, 91 Idaho 274, 420 P.2d 645 (1966); and Day v. Northwest Division 1055, et al., 238 Or. 624, 389 P.2d 42 (1964). It is the opinion of this court that the issues in this case are identical to those presented in International Ass'n. of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958), and as such require an affirmance of the decision below. However, since the decisions in Borden and Perko have to some extent impaired the vitality of Gonzales, we feel that further elaboration of the facts and law relied upon must be made and the scope of Lockridge limited as set forth herein.
Wilson P. Lockridge was born October 15, 1915. He had a limited education, completing his formal education at the conclusion of the 8th grade. Between the ages of approximately fourteen and twenty-two, he was employed on his father's farm. Thereafter, from 1937 until May 1943 he drove truck for a creamery. In May of 1943 respondent Lockridge went to work for Union Pacific Stages, driving a bus. At that time he also became a member of the appellant union. In 1945 Lockridge began working for Greyhound Corporation or a subsidiary thereof which acquired Union Pacific Stages. Thereafter Lockridge was continually a member of the union and employed by Greyhound until November 2, 1959. On November 11 or 12, 1959, after returning from a hunting trip, Lockridge was informed that his membership in the union had been terminated and a request had been made by the union to representatives of Greyhound that his employment be *721 terminated. The contents of this letter, dated November 2, 1959, is set forth as follows:
"Mr. W.H. Egger, Regional Manager Eighth and Stewart Streets Seattle, Washington
Dear Mr. Egger:
Mr. Elmer J. Day and Mr. W.P. Lockridge are not in good standing in our Union. They have suspended themselves from membership so in compliance with Section 3 of Contract B, I am asking that you remove them from employment.
 Sincerely,
 /s/ C.A. BANKHEAD
 C.A. Bankhead
 Financial Secretary"
At that time a contract existed between appellant and Greyhound which contained the following pertinent provision referred to in the Bankhead letter:
"3. Membership in and Recognition of the Association, Grievances and Arbitration: (a) All present employees covered by this contract shall become members of the ASSOCIATION not later than thirty (30) days following its effective date and shall remain members as a condition precedent to continued employment. This section shall apply to newly hired employees thirty (30) days from the date of their employment with the COMPANY."
The pertinent part of the Union's Constitution and General Laws, provided as follows:
"DUES, SUSPENSIONS AND REINSTATEMENTS
"Sec. 91. All dues, * * * of the members of this Association are due and payable on the first day of each month for that month, * * * * They must be paid by the fifteenth of the month in order to continue the member in good standing. * * * A member in arrears for his dues, * * * after the fifteenth day of the month is not in good standing * * * and where a member allows his arrearage in dues, fines and assessments to run into the second month before paying the same, he shall be debarred from benefits for one month after payment. Where a member allows his arrearage for dues, fines and assessments to run over the last day of the second month without payment, he does thereby suspend himself from membership in this Association, * * * * Where agreements with employing companies provide that members must be in continuous good financial standing, the member in arrears one month may be suspended from membership and removed from employment, in compliance with terms of the agreement." (Emphasis added.)
It is obvious from a reading of the materials quoted above, that Lockridge was not subject to suspension or dismissal from the union for non-payment of October dues on November 2, 1959. It is equally obvious that Mr. Bankhead confused Section 3 of Contract B, the only one applicable to Lockridge with Section 3 of Contract C, which provided for suspension of members not in good standing.[1]
*722 At this point it is interesting to note the results of the divergent remedies which were sought by the two suspended members. Day immediately filed an unfair labor practice charge with the N.L.R.B. Seattle Regional Office. Lockridge began petitioning the union for redress of his grievances. Day's petition was rejected by the regional director of the N.L.R.B.[2]
Lockridge's appeal was rejected by the union.[3]
*723 The basis for the Regional Director's decision is not too clear, but it is obvious that the union had terminated Lockridge's membership. On the other hand, Greyhound, by letter of February 2, 1960, obviously felt obligated to withhold employment from Lockridge until his membership status in the union was restored. Thus Lockridge (and Day for that matter) could not be employed by Greyhound until restored to membership. At this point it must have been clear to both men that they would not obtain relief from either the union, the employer or the N.L.R.B. Therefore, they each turned to their respective state courts. After the jury had returned a verdict in Day's favor, the union appealed to the Oregon Supreme Court, which reversed the judgment in Day v. Northwest Division 1055, et al., 238 Or. 624, 389 P.2d 42 (1964), stating that the subject-matter had been pre-empted and that Borden and Perko were controlling. The United States Supreme Court denied review.
Appellant's position may be summarized by three contentions: (1) Congress has pre-empted all state court jurisdiction over union-member relationships since it has comprehensively regulated the field. (2) There was no unfair labor practice because Lockridge's dismissal from the union and consequently from employment was in accord with union rules and the contract and therefore was protected by the proviso to sec. 8(b) (1) (A) and sec. 8(b) (2) of the National Labor Relations Act[4] and at the very least there would be no cause of action. (3) If this was not a proper dismissal in accordance with union rules and the contract, then the dismissal was in violation of 8(b) (1) (A) generally and 8(b) (2) in particular and therefore an unfair labor practice. In other words, a union cannot, first of all and in general, impair the right *724 of an employee to either join or refrain from joining a union, in violation of 8(b) (1) (A) and, second of all, in particular, a union cannot cause the employer to discriminate against an employee by having the former terminate the latter's employment for some reason other than non-payment of regular dues, in violation of 8(b) (2). The union then argues that since the trial court found Lockridge had paid his dues on time the union necessarily committed an unfair labor practice. Therefore, since San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) held that conduct which was arguably an unfair labor practice was pre-empted, the union's conduct in this case being certainly an unfair labor practice must be pre-empted. We shall deal with each of these contentions in order.
(1) There is total pre-emption of the field.
This proposition is not true. Appellant's argument on this point sweeps with too wide a broom. We find under part (3) hereinafter that this court has jurisdiction over the particular subject matter of this particular suit, and it necessarily follows that the broad proposition of total pre-emption, which appellant argues here, is not valid.
(2) This was a proper dismissal and therefore protected activity.
This argument, too, can be summarily dismissed because appellant has conceded on this appeal that it did not dismiss respondent in accordance with either union rules or the contract with Greyhound. Furthermore, appellant did not seriously contend otherwise in the court below since its arguments were almost exclusively directed toward the court's jurisdiction with respect to service of process and subject-matter jurisdiction. Finally, it is readily apparent, on the basis of those portions of the labor contract and the union constitution hereinbefore cited, that this is a position which is untenable. The trial court so found[5] and no appeal was taken therefrom.
(3) This was an unfair labor practice and therefore pre-empted.
This brings us, then, to appellant's most serious argument. At the outset, we concede much of what appellant argues. Appellant, in the opinion of this court, did most certainly violate 8(b) (1) (A), did most certainly violate 8(b) (2) (i.e., see Krambo Food Stores, Inc., 114 N.L.R.B. 241 (1955) and probably caused the employer to violate 8(a) (3)[6], all of which *725 constitute unfair labor practices, all of which are subject to the exclusive cognizance of the National Labor Relations Board and are not subject to adjustment by, or interference with, Idaho courts. However, in addition to at least three unfair labor practices appellant did commit a breach of the contract between itself and W.P. Lockridge, a member. That contract provided that Lockridge would have continued membership in his union so long as he paid his dues no later than the end of the second month after they became due. None of the cases cited by appellant stands for as broad a proposition as that for which appellant contends. Pre-emption is not established simply by showing that the same facts will sustain two different legal wrongs. This would be analogous to precluding a contract action by proving the facts also establish a tort. The conflict to be avoided is two different bodies, analyzing the same facts, reaching the same or different interpretations of those facts and apply conflicting remedies. In this case, as will be pointed out later, the conflict between this court and the N.L.R.B., if extant, is not significant and the result we reach is consistent with the underlying policy of the national labor legislation.
Of course, it is not enough to simply state that this is an internal union matter. The "internal union matter" must be of a particular nature. The suit must be limited so that it focuses "on purely internal union matters, i.e., on relations between the individual plaintiff and the union not having to do directly with matters of employment, and that the principal relief sought [must be] restoration of union membership rights." Local 100 of United Ass'n of Journeymen & Apprentices v. Borden, 373 U.S. 690 at page 697, 83 S.Ct. at page 1427; International Ass'n. of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018. From the outset respondent attempted to regain his membership. This is the import of all his correspondence with the union. The only record of contact with the employer are the two letters from Greyhound informing him of his termination. The only relationship his employment has to this case is a means by which damages can be computed. The complaint upon which this cause was finally submitted was that Lockridge was wrongfully deprived of membership. By his complaint he sought damages and equitable relief. His prayer for equitable relief was framed in general terms and this court concludes that in this case or any other within the narrow area where we can assert jurisdiction to relieve wrongfully denied membership, the primary relief which can and shall be granted is restoration of union membership. Damages, if any, are a secondary consideration, and shall be limited to compensation for damage suffered until such time as membership is restored.
Restoration of union membership is not a remedy which the N.L.R.B. can afford. International Ass'n. Machinists v. Gonzales, supra. Under the law of Idaho, membership in a labor union constitutes a contract between the member and the union. Lockridge v. Amalgamated Ass'n of St. El. Ry. & M.C. Emp., 84 Idaho 201, 369 P.2d 1006 (1962). Our decision in this case is designed solely to give "legal efficacy under state law to the rules prescribed by a labor organization for `retention of membership therein.'" International Ass'n. Machinists v. Gonzales, 356 U.S. at page 620, 78 S.Ct. at page 925. The purpose *726 for which we exercise jurisdiction is to avoid leaving "an unjustly ousted member without remedy for the restoration of his important union rights." "Such a drastic result, on the remote possibility of some entanglement with the Board's enforcement of national policy, would require a more compelling indication of congressional will than can be found in the interstices of the Taft-Hartley Act." Gonzales, 356 U.S. at page 620, 78 S.Ct. at page 925.
As previously pointed out, there may have been violations of the Act, but the Board in such a case would focus on the union-employment relationship and order restoration of employment. The Board's power to make such an order and determination precludes any such determination by this court or any interference by the court with the employee-employer relationship. However, the Board cannot restore membership in the union; this court can. Gonzales, supra. Also, the National Labor Relations Board could not give respondent the relief that Idaho law can give him according to our local law of contracts and damages. Additionally, the possibility of partial relief from the Board does not, in such a case as is here presented, deprive a party of available state remedies for all damages suffered.
"If, as we held in the Laburnum [347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025] case, certain state causes of action sounding in tort are not displaced simply because there may be an argumentative coincidence in the facts adducible in the tort action and a plausible proceeding before the National Labor Relations Board, a state remedy for breach of contract also ought not be displaced by such evidentiary coincidence when the possibility of conflict with federal policy is similarly remote. The possibility of conflict from the court's award of damages in the present case is no greater than from its order that respondent be restored to membership. In either case the potential conflict is too contingent, too remotely related to the public interest expressed in the Taft-Hartley Act, to justify depriving state courts of jurisdiction to vindicate the personal rights of an ousted union member. This is emphasized by the fact that the subject matter of the litigation in the present case, as the parties and the court conceived it, was the breach of a contract governing the relations between respondent and his unions. The suit did not purport to remedy or regulate union conduct on the ground that it was designed to bring about employer discrimination against an employee, the evil the Board is concerned to strike at as an unfair labor practice under § 8(b) (2). This important distinction between the purposes of federal and state regulation has been aptly described: `Although even these state court decisions may lead to possible conflict between the federal labor board and state courts they do not present potentialities of conflicts in kind or degree which require a hands-off directive to the states. A state court decision requiring restoration of membership requires consideration of and judgment upon matters wholly outside the scope of the National Labor Relations Board's determination with reference to employer discrimination after union ouster from membership. The state court proceedings deal with arbitrariness and misconduct vis-a-vis the individual union members and the union; the Board proceeding, looking principally to the nexus between union action and employer discrimination, examines the ouster from membership in entirely different terms.' Isaacson, Labor Relations Law: Federal versus State Jurisdiction, 42 A.B.A.J. 415, 483." (International Ass'n. Machinists v. Gonzales, 356 U.S. pages 621 through 623, 78 S.Ct. pages 925 through 926.
This, then was the state of the law and its application to this case at the time of the Gonzales decision. However, appellant insists that this decision is altered by subsequent cases.
*727 The landmark case, cited as the genesis of the trend limiting Gonzales, is San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Garmon was written by Justice Frankfurter, author of the Gonzales decision. The case itself arose out of a recognitional dispute between two unions and an employer. It involved conduct which represented one of the vital tools of organized labor and a protected right for all employees  picketing. The parties disputed over whether the picketing was unprotected coercion or protected publicity The N.L.R.B. declined jurisdiction. California courts asserted jurisdiction because the Board had declined to do so and then the state courts enjoined the picketing. Justice Frankfurter, in reversing the state court decision, began by quoting from Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955):
"`By the Taft-Hartley Act, Congress did not exhaust the full sweep of legislative power over industrial relations given by the Commerce Clause. Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in Garner v. Teamsters Union, supra [346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228]. But as the opinion in that case recalled, the Labor Management Relations Act "leaves much to the states, though Congress has refrained from telling us how much." 346 U.S. at page 488, 74 S.Ct. at page 164. This penumbral area can be rendered progressively clear only by the course of litigation.'" 359 U.S. at page 240, 79 S.Ct. at page 777.
Justice Frankfurter then expanded on these basic considerations:
"We have been concerned with conflict in its broadest sense; conflict with a complex and interrelated federal scheme of law, remedy, and administration. Thus, judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted. When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting. However due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. See International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." 359 U.S. at pages 243-244, 79 S.Ct. at page 778.
The central rule of the case was then reached, in the following language:
"When it is clear or may fairly be assumed that the activities which a State purported to regulate are protected by § 7 of the National Labor Relations Act, or constituted an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict *728 between power asserted by Congress and requirements imposed by state law." 359 U.S. at page 244, 79 S.Ct. at page 779.
In applying this rule to the facts it was pointed out that the particular conduct sought to be regulated was assumed to be, and was treated as, an unfair labor practice.
"The adjudication in California has throughout been based on the assumption that the behavior of the petitioning unions constituted an unfair labor practice. This conclusion was derived by the California courts from the facts as well as from their view of the Act." 359 U.S. at page 245, 79 S.Ct. at page 779.
The court concluded that it did not matter whether this was protected or prohibited activity, or even whether the Board asserted jurisdiction. The issue, then was, was this a class or type of conduct which was arguably subject to the Board's cognizance, which by their administration and promotion of the policies of the act could best be handled? Was there "uncertainty" as to whether an act or practice would be protected or not?
The distinction between the type of conduct in Garmon and the type of conduct here is clear. The former involved the most fundamental aspects of concerted action, the very heart of the national labor policy, over which the regulatory power of the Board has never been questioned. Here the conduct centers on membership rights in the union, critical from an individual member's viewpoint, but conduct, excluded from the operation of the act. The remedy sought here does not impair the assertion of collective rights but rather, guarantees the availability of those collective rights to individual members. As can be no more clearly presented than by the facts in this case themselves, if this court did not assert jurisdiction, respondent would never regain his union membership.
Appellant, however, insists that the "arguably subject" test is the one which now applies to this class of cases, citing Local 100 of United Ass'n of Journeymen & Apprentices v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963), and Local No. 207, International Ass'n etc. Iron Workers v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963). However, Justice Harlan, in those cases specifically distinguished the situations presented there from Gonzales and he pointed to many important policy questions involved in those cases which were more properly to be decided by the Board.
Borden and Perko never sought reinstatement in the union. They had never been denied their membership. In both cases the individuals complained that they had been denied the benefits of a particular job. Borden wanted to work for a particular employer and was, for apparent disciplinary reasons, refused a necessary referral by the union. Perko complained that he was not able to work as a foreman or superintendent. The court said of Perko:
"As in Borden, the crux of the action here concerned alleged interference with the plaintiff's existing or prospective employment relations and was not directed to internal union matters." 373 U.S. at page 705, 83 S.Ct. at page 1431 (emphasis added)
Furthermore, Borden involved "difficult and complex problems inherent in the operation of union hiring halls" while Perko presented "difficult problems of definition of status * * * of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole."
The result we reach is contrary to that reached in Day v. Northwest Division 1055, et al., 238 Or. 624, 389 P.2d 42 (1964). However, in Day there is a specific finding of discrimination on the part of the union. In light of such a finding an unfair labor practice would be established. There was no such finding in this case and the conclusion of the court below is one amply supported by the evidence and one in which we concur. This was a *729 misinterpretation of a contract. Whatever the underlying motive for expulsion might have been, this case has been submitted and tried on the interpretation of the contract, not on a theory of discrimination. The fact that the Board might go deeper into the union motivation and discover an unfair labor practice simply serves to point up the distinction between the facts we focus upon and those which the Board would focus upon. That the Board might find an unfair labor practice in both an underlying "discriminatory" motivation and an honest misunderstanding of the contract, is simply a determination which is necessary to establish the Board's jurisdiction and its power to enforce the remedies within its cognizance.
However, aside from this distinguishing point in Day, we also believe that the majority there took too shallow a view of the case law and pertinent legislation. Rather, we believe the opinion of Justice Perry, dissenting, to be the better reasoned.
After the trial on the merits, the trial court made certain findings of fact to which appellant has made no assignments of error on appeal and therefore such findings are necessarily binding on this court. Among such findings are the following:
"That on November 2, 1959, plaintiff [respondent herein] had over 16 years seniority as a bus driver under the laws of the union and the employment contract, and such seniority commensurate rights and benefits and working privileges and compensation to be received therefrom.
"That on or about November 2, 1959, C.A. Bankhead, treasurer and financial secretary of Division 1055, acting in his official capacity and within the scope of his activities as a treasurer and financial secretary and, under the facts and reasonable inferences to be drawn therefrom, acting for the International Association and pursuant to the knowledge and approval of it, if not direct advice or ordered from, the International Association president, and International vice-president, and a member of the general executive board of the International Association, suspended plaintiff from membership in the union on the sole grounds that plaintiff was in arrears in payment of dues contrary to the requirements of the constitution and general laws of the union, and by letter dated November 2, 1959 notified the employer Western Greyhound Lines that plaintiff was no longer a member in good standing in the union and requested said employer to remove him from employment. That immediately following receipt of such notice from C.A. Bankhead, the employer discharged plaintiff from employment. One Elmer Day was likewise suspended under identical circumstances. (Emphasis added.)
"That at the time plaintiff's wife was notified of plaintiff's suspension from union membership in early November, 1959 (plaintiff was elk hunting during a vacation period) plaintiff's wife, by letter dated November 10, 1959, submitted to C.A. Bankhead, financial secretary of the Division 1055 a check to cover plaintiff's dues for both October and November but the said C.A. Bankhead refused to accept the same and the check was returned (Exhibit 5).
"Following his return to Boise in mid November, 1959, and immediately upon learning of his suspension from union membership with resulting termination of his employment, plaintiff contacted C.A. Bankhead requesting advice as to what he could do to obtain reinstatement of his union membership and on several occasions submitted checks for his arrearages and penalties all of which were refused. (Emphasis added.) * * *"
The trial court additionally found that section 93 of the union constitution provided:
"that where members are in arrears past the last day of the second month they shall, at the last meeting of each month, be reported by the financial secretary *730 as having suspended themselves from membership except where members are suspended in compliance with the terms of agreements, the members may be so reported and suspended after the period of one month. That at the time of their suspension from membership in the International Association on or about November 2, 1959 plaintiff and said Day were in arrears in payment of their dues only since the first day of October 1959."
As previously mentioned in this opinion, no appeal has been perfected from any of the findings of fact. Additionally, on the basis of what respondent's replacement, a man named Carter, actually earned in the years 1959 through September 15, 1965, in the same employment which respondent had prior to his unlawful suspension by the union, the court found that during that period respondent had suffered a loss in earnings of approximately $32,678.56, i.e., the difference between what he would have earned at his regular employment as a bus driver and what he did earn as an employee of the Highway Department of the State of Idaho, and on that basis the trial court awarded respondent damages for loss of wages in the sum of $32,678.56. In the judgment the trial court further decreed that the respondent be restored to membership in the union upon tendering payment of his current dues.
As it was first rendered and filed, the judgment also provided that respondent should be restored to his seniority rights. However, upon motion to amend the findings of fact, conclusions of law and judgment, the trial court, after hearing thereon, struck from the decree and from the findings and the conclusions such restoration of seniority rights and also a provision allowing the respondent the sum of $3,500 per year in damages from the union from and after September 15, 1965 until he had been restored to membership and full seniority rights. This is the state of the judgment from which the appeal was taken on the three contentions by appellant, disposition of which has already been made.
Respondent by way of cross-appeal raised several issues, the most important of which is that of restoration of seniority rights. In order to grant respondent the full equity to which he is entitled, in addition to the money damages awarded him by the trial court, he must necessarily be restored by the appellant union to full seniority rights. The trial court, therefore, was in error, in striking from the findings of fact and conclusions of law and the judgment the restoration of such rights, upon motion of appellant. Upon remanding of this cause the trial court is hereby ordered to restore these rights of seniority to respondent.
Respondent additionally contends that the trial court erred in not awarding damages in the amount of overtime compensation which Lockridge could have worked. The trial court was the finder of facts and since the court was not convinced that Lockridge could or would have worked the overtime in question, this portion of the judgment is affirmed.
Finally, respondent prayed for damages of $50,000.00 for discomfort, embarrassment, humiliation and mental anguish and the trial court specifically found that such elements did exist from the facts adduced at the trial but omitted to award any sum for such damages. Respondent assigns this as error. Such damages must necessarily be based upon mental suffering and the attempt to recover them from a breach of contract has generally been met with disfavor by the courts. Denial of damages is based upon several grounds, e.g., remoteness of the injury from the breaching act; lack of an adequate standard or measure of such damages; the danger of speculative and easily simulated injuries which would be difficult to disprove; and the inevitable fear of increased litigation. There is a growing tendency to consider mental damages as a proper element in these actions just as in actions sounding in tort; but this is definitely a minority viewpoint, and we choose to adhere to the majority holdings which deny *731 such recovery. See 32 Notre Dame Lawyer 482. Thus the trial court committed no error in not awarding such damages to respondent.
In thus disposing of the various contentions of the parties we reach a decision which, rather than conflicting with federal labor policy, seeks to strengthen an underlying philosophy of that policy, i.e., one is entitled to gainful employment and the fruits of collective bargaining; and this is so, regardless of the employee's attitude toward the union or his failure to cooperate with a certain union policy  such as the automatic checkoff  with which he personally disagrees. The policy considerations behind this decision do not militate against the discipline which is necessary to preserve the goals of concerted action, but rather militate in favor of the basic purpose for which national labor law was created: to provide the working-man with a fair share of the fruits of his labor.
Judgment affirmed, as modified, and remanded for restoration of respondent's seniority rights in the union, such judgment further reserving to respondent the right to petition the district court for final determination of damages for loss of earnings accruing since September 15, 1965. Costs to respondent.
McFADDEN and DONALDSON, JJ., and SCOGGIN, D.J., concur.
McQUADE, Justice (dissenting).
The majority today reaches a position which is, perhaps, tenable as a matter of pure logic.[1] I can not, however, agree with them that it is the law. They attempt to fit this case within the too-narrow "internal union matter" exception to the doctrine of federal pre-emption in labor law. That niche is entirely too small to accommodate this particular action. Although this ground has been plowed here before,[2] a recapitulation of the United States Supreme Court cases, and the principles which may be derived therefrom, may serve to indicate more precisely the errors upon which the majority opinion is founded.
For over a decade prior to 1959, the Supreme Court sought delicately to adjust the relationship of state and federal powers in the area of labor adjudication in order optimally to serve the competing purposes of the national labor legislation and the values of our federal system. Although that process contributed greatly to the confusion with which we are involved in this case, a recapitulation of a few of the leading cases of that period will serve to explicate the full scope of the pre-emption doctrine announced in San Diego Building Trades Council v. Garmon.[3]
The first of the important cases was Garner v. Teamsters etc. Union,[4] which involved an attempt to induce the State of Pennsylvania to enjoin picketing which was fairly clearly a matter for the N.L.R.B. In the course of an opinion holding the dispute not to be a proper object of state jurisdiction, a number of elements, thought to be important in pre-emption cases were discussed. That case was distinguished *732 from those involving injurious conduct which the National Labor Relations Board had no express power to prevent and which was, therefore, either "governable by state law or it is entirely ungoverned." And the case was found to be one not involving mass picketing or threats to the public peace and safety and, therefore, a "local matter."
In Garner there were three principles upon which the affirmative holding of pre-emption was founded. The first was the oft-repeated theory that the very core of the pre-emption doctrine was a conflict of remedies. Justice Jackson seemed to mean that if a state court would provide a sanction for conduct which was subject to N.L.R.B. cognizance when the federal tribunal would not allow such a sanction, then there was a "conflict between state and federal remedies." This actually seems to mean that the conflict to be avoided is between differing substantive standards of primary and not remedial law, but Justice Jackson phrased it in terms of remedies and that phrasing was very important until Garmon, six years later. The second principal leg for Garner was that the federal labor law plan not only comprehended a set of new rules, but also a new tribunal, with its own procedure and system of remedies; this was a comprehensive system of regulation, interference with any part of which was likely to damage the entire fabric. "A multiplicity of tribunals and a diversity of procedures are quite as likely to produce incompatible or conflicting adjudications as are different rules of substantive law." And the final leg for the Garner decision was a corollary to the other two. It was that, when a matter was subject to the invocation of the federal labor law, the congressionally devised Labor Board had primary jurisdiction to interpret the substantive law expertly and uniformly.
The next key case was United Construction Workers v. Laburnum Constr. Co.[5] This case involved a series of riotous attempts by a subsidiary union of the United Mine Workers to organize some A.F.L. employees of a building contractor who happened to have a job in coal-mining country. The state court tort judgment was upheld by the United States Supreme Court as not pre-empted. In so holding that Court assumed that the conduct involved constituted an unfair labor practice. The Garner case was distinguished therein, because in that case Congress had provided a preventive remedy exactly parallel to that which the state court was asked to impose. Laburnum, it was said, involved no such conflict of remedies because "Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct." Pre-emption was, thus said to turn on whether or not the N.L.R.B. could give the same relief which the state sought to provide. Justice Douglas filed a dissent in Laburnum.[6] It was his position that the federal law was a comprehensive system of rules, procedures and remedies which was designed to avoid disruptions of commerce by bringing labor disputes to orderly and rapid conclusions. The provision of an alternative, lucrative state court remedy would upset this delicate balance and cause controversies to live long in the courts, depriving the federal scheme of its healing effects and keeping old wounds open.
Following Laburnum, the next case which attempted further to elucidate the theoretical underpinning of pre-emption was Weber v. Anheuser-Busch, Inc.[7] In that opinion, holding that a state anti-trust law injunction would not lie, Mr. Justice Frankfurter reiterated the Garner theory of primary jurisdiction to decide what was prohibited and what protected and the notion that the crux of the pre-emption matter *733 was the conflict of remedies. Garner was, thus, said to turn on the fact that there were "two similar remedies, one state and one federal, brought to bear on precisely the same conduct." And it was on this ground that the Laburnum case was distinguished, "the violent conduct was reached by a remedy having no parallel in and not in conflict with, any remedy afforded by the federal Act." While much of this still sounded as if a conflict of primary rules was the difficulty, the reference to Laburnum only served to emphasize that it was competition among remedies which was considered crucial. Weber finally declared that it did not matter that the state power was invoked to serve some regulatory purpose other than the ordering of labor relations. The pre-emption doctrine protected the N.L.R.B.'s primary jurisdiction to characterize and remedy conduct. Competition with that competence from state tribunals was not to be countenanced on any theory.
The final pre-Garmon cases which are important here are the Gonzales[8] and Russell[9] cases wherein the court was again able to hold no pre-emption. These two cases might be said to have represented the high-water mark of concurrent state jurisdiction in labor law. The Russell case involved a very ambiguous fact situation stemming from conduct which was either very nearly as egregious as that in Laburnum or else no more disorderly than might be expected in any tense, major strike. In upholding an award of exemplary and compensatory damages (as compensation for lost wages during the strike) the United States Supreme Court further muddied the waters. Where Garner had rejected a distinction between actions to vindicate public rights from those to compensate private rights and where Weber had rejected the notion that there was a relevant distinction between state general law and state labor law, the Russell case seemed to go in exactly the opposite direction. Although there was an N.L.R.B. remedy which exactly duplicated the compensatory damages for lost wages, the Russell opinion held that there was no conflict of remedies. This, it was reasoned, was because the principles which supported the state court action were private principles of general law, while those underlying the N.L.R.B. action were designed to vindicate public rights and "to effectuate the purposes of the Federal Act." Therefore, it was said, precisely the same sanction directed at precisely the same conduct (and justified by findings of a non-expert, non-federal tribunal) did not constitute a conflict of remedies. After Russell it could reasonably be said that general state tort law sanctions could be freely directed at labor relations activity which, based upon state court findings of fact, was not protected by federal law.
Gonzales, upon which the majority relies so heavily, was decided on the same day as Russell. It was a California contracts case in which a union member, who claimed to have been wrongfully expelled from his union, was ordered reinstated and given damages for lost wages as well as for mental and physical suffering caused by the union's breach of contract. Justice Frankfurter, again writing for that Court, admitted that there might be an unfair labor practice made out by the facts, but preferred to characterize the action solely as one giving effect to a union member's rights without reference to extra-union employment or labor relations factors. This was so even though the damages given closely paralleled the award which the National Labor Relations Board could have imposed if it had found an unfair labor practice. The possibility of conflict with national labor policy was, for no articulated reasons, said to be "too contingent, too remotely related to the public interest *734 expressed in the Taft-Hartley Act, to justify depriving state courts of jurisdiction to vindicate the personal rights of an ousted union member."[10] This conclusion, which in terms of legal and logical argument was mere ipse dixit, was "emphasized" by an examination of the way in which the lower courts and the parties characterized the action. It was a contracts action and, therefore, it served "internal" purposes. If it had been a labor law case, presumably, it would have been "external" and pre-empted. Justice Frankfurter's examination of the theory of the pleadings to establish the distinction between the state's focus on internal union matters and the national focus on external labor relation matters smacks somewhat of the aridity of the ancient forms of action.
After 1958 it might readily be concluded that there was a wide area of activity, or cases, or remedies which were solely the province of the National Labor Relations Board. And, especially after Gonzales and Russell, it could be as well concluded that there was as wide an area which was subject to the concurrent jurisdiction of the state and national tribunals. There was not, however, any well-evolved set of clear principles which could be applied to determine into which category a given case might fall. As we pointed out the first time that Mr. Lockridge's litigation was before us, the law in the area was confused and unsettled.[11] The various cases seemed each to announce a new rationale repugnant to the last. The difficulty, as the justices had never ceased to mention and as professor, and later solicitor general, Cox had early pointed out, was that Congress had never delineated the boundaries of the two jurisdictions.[12] The Supreme Court had attempted to fill this breach by statutory interpretation which was based on the assumption that there had to be some, but not much, concurrent state jurisdiction.[13] Professor Cox had rightly warned that this allowance of simultaneous jurisdiction over the same matter would ultimately lead to excessive litigation and confusion as every point of state law would ultimately have to be passed on by the United States Supreme Court.[14] That Court's effort to draw the jurisdictional boundaries according to sensitive, subtle judgments about the relative positions of the competing state and national interests through a process of "litigating elucidation" on a case by case basis had, as we have seen, come a cropper. The justices had simply been unable to state coherently what the controlling considerations were. Some of the supposed "principles," especially the notion of conflict of remedies, seemed to be tenuously related to considerations of national labor policy at best. It was this background against which the strict, even "wooden" rule of the Garmon case stands so starkly. A careful reading of Garmon indicates that in it, the majority of the Supreme Court, led again by Justice Frankfurter, embarked on a new course departing substantially from the line of decisions which preceded it.
The majority opinion in San Diego Building Trades Council v. Garmon[15] began by describing the difficult process of attempting to give meaning to a statutory framework which was vague, poorly foreseen or utterly unperceived as a process of "giving application to congressional incompletion." This complaint of congressional *735 inactivity was followed by a plea that, if a better and more sensitive demarcation than that provided by the courts was wished, it was up to the Congress to draw better and more precise boundaries by enactment. This suggested action, echoing Professor Cox's argument made five years before, if it had been acted upon by the National Congress, might well have saved the parties and the courts of Idaho most of the time and money expended in litigating the jurisdictional question in this case.
Having concluded that the legislature had not given the courts much guidance, Justice Frankfurter explicitly disavowed the attempted, subtle, case-by-case decisional process of the preceding decade.
"The nature of the judicial process precludes an ad hoc inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particularly what exact mischief such a conflict would cause."[16]
This is directly at war with the spirit of "elucidating litigation" which had animated the previous cases. But, if this were not enough, the point was emphasized as Justice Frankfurter began to review the law derived from the cases. Not all reasoning in them was of determinative importance, and much of the language used in the past did not articulate the principles upon which the decisions rested:
"We state these principles in full realization that, in the course of a process of tentative, fragmentary illumination carried on over more than a decade during which the writers of opinions almost inevitably, because unconsciously, focus their primary attention on the facts of particular situations, language may have been used or views implied which do not completely harmonize with the clear pattern which the decisions have evolved."[17]
And, in any event, the process of elucidation was now over, and the court was going to state the correct rules to decide cases based on a decade's experience. Garmon was clearly and consciously meant to strike a new course.
But a new course as to what? The majority in today's opinion would restrict Garmon to cases involving picketing. Justice Frankfurter's words, however, do not support that conclusion. The issues decided by the Garmon case were framed as broadly as possible.
"The case before us concerns one of the most teasing and frequently litigated areas of industrial relations, the multitude of activities regulated by §§ 7 and 8 of the National Labor Relations Act. * * * The extent of which the variegated laws of the several States are displaced by a single, uniform, national rule * * *."[18]
There was no broader way to frame the issue in the case. When a justice as experienced, precise and lawyer-like as was Justice Frankfurter so obviously chooses to have a case cover the most ground possible, we can only conclude that the decision to be doctrinaire was purposeful.[19]
Having clearly indicated that Garmon was to state a new rule for the entire catalogue of labor law pre-emption cases, the opinion went on to state the salient considerations which underlay the new doctrine.
"The unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of *736 the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience."[20]
Citing Garner, the court also noted that the N.L.R.B. had, as an expert tribunal, primary jurisdiction over questions within its competence.[21] And, most importantly, the court referred to the completeness of the federal regulatory scheme, the dense inter relationship between the rules, the administrative process, the expert agency and the remedies. Therefore pre-emption was necessary whenever this delicate and purposeful national law system might be encroached upon in any way.
"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 * * * [or prohibited by] § 8, due regard for the federal enactment requires that state jurisdiction must yield."[22]
And, because it is often not clear when matters are subject to either section or are meant to be utterly unregulated and because the pre-eminent principle is complete respect for the federal scheme,
"When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."[23]
The governing consideration was the necessity of absolute avoidance of even potential interference with federal labor policy.
There were only two narrow exceptions allowed to this rule of practically total pre-emption. The first was conduct which breached or threatened to breach the public peace. The Laburnum and Russell cases were limited in their holdings to this narrow rule. The second exception was conduct which was of only "peripheral concern" of the Act. Gonzales was the only case cited for this last proposition.
And, finally, Garmon rejected much of the reasoning in the old cases. Remedies, conflicting or otherwise, were no longer determinative. The language about conflicting remedies in Laburnum was explicitly rejected. It was conduct alone which was regulated. If the conduct even arguably came within the scope of the national policy, all adjudication about it had to be commenced in the N.L.R.B. Also the distinctions between general laws and specific labor regulation, or those based on the characterizations of the parties, juries, or state tribunals were not of importance. It was, again, state regulation of conduct  no matter on what theory  which was to be avoided. If the activities which inspired the litigation were even arguably among those which had been entrusted to the judgment of the expert National Labor Relations Board for application of the comprehensive scheme of federal rights and remedies, then jurisdiction was solely in the national board. Any intervention in such areas by the inexpert state courts, even if the Board would not, in its discretion, choose to rule on the merits, was absolutely prohibited by Garmon.
The Garmon case, thus, represents a watershed in the jurisprudence of pre-emption. It purported to be and was a complete break with the decisions in the past. It stated a simple, omnibus rule: if conduct was even arguably subject to adjudication by the expert National Board it was ungovernable by state power. It narrowed the *737 permissable scope of state jurisdiction to conduct which threatened good order or which was utterly irrelevant to national policy. And it foreclosed recourse to the confused jumble of cases out of which it was born. It was now to be the rule in Garmon's case which was to control. The preceding cases had vitality only to the extent allowed them by Garmon. The rule was intentionally crude, even "wooden", because it was, at least in part, designed to provide a "bright line" for deciding jurisdictional issues and, thereby, to cut off the cascade of state court litigation which the cases through Russell and Gonzales threatened to inspire.[24] It is possible that, in declaring this unsubtle rule in reaction to the confusion of the preceding decade, the Supreme Court of the United States was guilty of throwing out the baby with the bath water. But even if that is so, under the Supremacy Clause this court has no choice but to follow that lead. Garmon is absolutely the controlling case.
While it was not perfectly clear that Garmon was the determinative decision when this case first came before this Court over seven years ago, it is now indisputable. In the ten years since the Garmon decision the cases in the United States Supreme Court[25] and in the state courts[26] which recognize the supremacy of the rule in that case are legion. The most important among these for our purposes are the Borden[27] and Perko[28] cases which the majority attempts, unsuccessfully, to distinguish from Lockridge. Those cases did not turn on the fact of membership or non-membership in the defendant union. The touchstone in each of those cases was a denial of the rights of a union member which effectively caused that member to be deprived of employment which he otherwise had. The form or theory of the pleadings, whether the action sounded in contract or in tort or was a hybrid labor relations case did not matter. After Garmon the key to analysis, when pre-emption is urged, is the character of the conduct. In Borden and Perko the court catalogued the ways in which the conduct complained of could "reasonably" arguably have been characterized by the expert National Labor Relations Board as either § 7 or § 8 conduct. This discussion, required for decision after Garmon, is what the majority refers to when it says "Justice Harlan * * pointed to many important policy questions involved in those cases which were more properly to be decided by the Board." That lengthy treatment is not needed in this instance; the majority concedes that the conduct complained of did indeed constitute an unfair labor practice. Following Borden and Perko and Garmon, that concession is all that is needed; the conduct is § 8 activity; jurisdiction is, therefore, pre-empted.
The majority, however, attempts to rely on the "distinction" which Justice Harlan drew between the Borden and Perko cases and Gonzales. The Gonzales case was different because, according to Justice Harlan, it "turned on the Court's conclusion that the lawsuit was focused on purely *738 internal union matters."[29] That, the majority would urge us to believe is also true here. There are two answers to that contention. The first is to hypothesize Mr. Lockridge's answer if we were to ask him if he would like his union membership back or his seniority rights and his damages, but not both. And the second answer, a corollary of the first, is that it is impossible to say that this Court in this case has not focused sharply on conduct touching Lockridge's employment relation when all of the relief  excepting restoration of simple union membership  necessarily had to turn on this Court's interpretation of § 3 of the collective bargaining contract between the defendant union and Greyhound. How could we award seniority rights and back wages to this plaintiff if we had not concluded that the union had not been acting in pursuance of a lawful union security agreement? And that determination is not "merely peripheral" to the Act nor is it one which involves wholly internal union matters. The conclusions which the Court has made in this case today are on precisely the sort of "difficult and complex problems" which, under the primary jurisdiction rationale of Garmon, are solely within the competence of the expert National Labor Relations Board. The problems of interpretation of the union charter and the bargaining contract here are no less difficult than are some of the "problems of definition" consigned to the Board in Perko. It is not, despite the ipse dixit of the majority, "obvious * * * that Lockridge was not subject to suspension or dismissal." And it is not for us to decide if our intrusion into the regulation of this conduct will "not militate against the discipline which is necessary to preserve the goals of concerted action, but rather militate in favor of the basic purpose for which national labor law was created." That determination, no matter what may be our own view of our competence, has been taken from us and vested wholly in the expert N.L.R.B., as a matter of federal law, under the Garmon rule. Whatever the current status of the Gonzales case might be, it is clear that the rule in the Garmon case, as applied in Borden and Perko, requires that the courts of Idaho refuse to assert the jurisdiction which they do not have in this case.
To make one point for a second time, the concession that the conduct regulated in this instance did probably constitute an unfair labor practice (which conclusion is not that terribly clear) should have ended this case. The statement by the majority that:
"Pre-emption is not established simply by showing that the same facts will sustain two different legal wrongs. This would be analogous to precluding a contract action by proving the facts also establish a tort,"
grossly misinterprets the Garmon-Perko-Borden rule which specifically rejects the notion that what is important is the theory upon which a case is tried. The rule is if conduct which is to be regulated is reasonably arguably covered by § 7 and § 8 of the Act, then the jurisdiction to regulate that conduct belongs solely to the national agency.
The correct rule is clearly a crude, simple device. It fails to make subtle distinctions "in order to ascertain the precise nature and degree of federal-state conflict * * and more particularly what exact mischief such a conflict would cause."[30] It is thus on purpose. It is designed to avoid the sort of confused and unbelievably protracted litigation with which we are faced in this case. It should have been allowed to have effect the first time this case came to this Court well over seven years ago. It should, as a function of our position in the federal system as defined by the Supremacy Clause, be given effect even now.
The Supreme Court of the United States sought for a decade to devise a better rule. *739 It could not. The rule which we have in Garmon is at least easy to apply  and we should apply it. If we are unhappy with this situation we can only plead with those responsible for the dominant federal law  the United States Supreme Court, and, more importantly, the Congress  to make a change.
NOTES
[1] "3. Membership and Recognition of the Association, Grievances and Arbitration:

(a) Any employee who now is a member in good standing or who, after May 15, 1946 (after May 1, 1951, for General Acct. Dept. employees), becomes or is reinstated as a member of the Association, shall, as a condition of continued employment, maintain such membership in good standing. Any employee first hired after May 15, 1946 (after May 1, 1951, for General Acct. Dept. employees), shall, as a condition of continued employment, become on or before thirty days from the date of hiring a member of the Association and thereafter maintain such membership in good standing."
[2] Elmer J. Day
Route 3, Box 90
Sherwood, Oregon
 Re: Western Greyhound Lines
 36-CA-986
 Street, Elec. Railway, and Motor
 Coach Employees, Div. 1055
 36-CB-238

Dear Mr. Day:
The above-captioned cases charging violations under Section 8 of the National Labor Relations Act, as amended, have been carefully investigated and considered.
As a result of the investigation, it appears that, because there is insufficient evidence of violations, further proceedings are not warranted at this time. I am therefore refusing to issue Complaint in these matters.
Pursuant to the National Labor Relations Board Rules and Regulations (Section 102.19), you may obtain a review of this action by filing a request for such review with the General Counsel of the National Labor Relations Board, Washington 25, D.C., and a copy with me. This request must contain a complete statement setting forth the facts and reasons upon which it is based. The request must be received by the General Counsel in Washington, D.C. by the close of business on December 28, 1959. Upon good cause shown, however, the General Counsel may grant special permission for a longer period within which to file.
 Very truly yours,
 Thomas P. Graham, Jr.
 Regional Director"

[3] Mr. Lockridge:
This will acknowledge receipt of your letter of January 18, 1960, requesting that I, or the General Executive Board, waive the provisions of Section 94 of the Constitution and General Laws of this organization in order that you might be reinstated to membership. Please be advised that, in my capacity as International President, I have no power to waive the provisions of the Constitution and General Laws.
Perhaps you have in mind Section 170A of the Constitution and General Laws which now provides as follows:
`The I.P., I.S.-T., Vice-Presidents and G.E.B. shall constitute a committee and shall have power, unless prohibited by the Labor-Management Reporting and Disclosure Act of 1959, to waive any clause of this Constitution by a three-fourths vote of this Committee, such action being binding upon the A.A. of S.E.R. and M.C.E. of A. only until the convening of the next Convention of the Association.'
The General Executive Board has ruled that Section 170A is intended to be used only in emergency situations and then only at the instance of the officers of the International Union or the General Executive Board when such situations threaten to impair the administration of the affairs of the Association or its Local Divisions. The Board has ruled that Section 170A was not intended to be available to an individual member or former member or to be a substitute for the appeal procedures of our Constitution and General Laws. Accordingly, the General Executive Board declined to process your request for waiver.
I wish to add, however, that even if I had the power to waive Section 94, I would not, on the basis of the information before me, be inclined to support your request. As I understand the facts, you were validly discharged for non-payment of dues on November 3, 1959, pursuant to the provisions of Section 3 of Contract B between Western Greyhound Lines and the Council of Western Greyhound Amalgamated Divisions and the various Amalgamated Divisions, including Division 1055. Your discharge had been requested by Division 1055, pursuant to the contract, for non-payment of dues within the time required under the Constitution and General Laws. You have offered no reasons and furnished no evidence as to why the Constitution and General Laws should be waived. Indeed, my investigation discloses that you were put on notice by the Division's letter of October 22, 1959 of the importance of paying your dues within the period required under the Constitution and General Laws. Nevertheless you thereafter failed to pay your dues as required by our laws.
I might add that in my opinion, the privilege of reinstatement under Section 94 is not available to a member discharged under Section 91 under a union security contractual provision. It is, however, unnecessary to rule on this point here.
 Very truly yours,
 /s/ JOHN M. ELLIOTT
 John M. Elliott
 International President"

[4] "(b) It shall be an unfair labor practice for a labor organization or its agents 

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section [7]: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;
(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been de-denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;" (29 U.S.C. § 158(b) (1); 29 U.S.C. § 158 (b) (2).
[5] (Finding of Fact VII). "That the contract agreement (Exhibit 35), * * * requires that all employees covered by the contract become members of the association not later than 30 days following its effective date and thereafter remain members as a condition precedent to continued employment. Section 91 of the Constitution of the International Association (Exhibit 34) provides that all dues, fines and assessments are due on the 1st day of each month and must be paid by the 15th of the month in order to continue the member in good standing. It further provides that a member in arrears after the 15th day of the month is not in good standing and not entitled to certain benefits and further, where a member allows his arrearages to run over the last day of the second month without payment, he does thereby suspend himself from membership in the association, meaning the International Association. * * * That at the time of their suspension from membership in the International Association on or about November 2, 1959, plaintiff and said Day were in arrears in payment of their dues only since the 1st day of October, 1959. * * *"
[6] "Sec. 8(a) It shall be an unfair labor practice for an employer 

* * * * *
(3) by discrimination in regard to hire or tenure of employment or any term of condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization * * * to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section [9(a)] * * *; Provided further, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;" (29 U.S.C. § 158(a) (3))
[1] See Michelman, State Power to Govern Concerted Employee Activities, 74 Harv. L.Rev. 641 (1961). Professor Michelman, in that thoughtful if not wholly realistic article, observed: "The more state courts are hemmed in by sweeping pre-emption rules which prevent them from reaching a sensible decision on the facts of a particular case, the more they are likely to struggle to evade or to avoid the rules. The disposition of difficult cases may not be greatly facilitated, and there will be some compulsion to a kind of lawlessness in the federal system which cannot be effectively policed." Id., at 683. That observation applies acutely to this case.
[2] Cox's Food Center, Inc. v. Retail Clerks Union, Local No. 1653, 91 Idaho 274, 420 P.2d 645 (1966).
[3] 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).
[4] 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953). The labor law pre-emption theory dates at least back to Hill v. Florida ex rel. Watson, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945).
[5] 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954).
[6] 347 U.S. 656 at 671, 74 S.Ct. 833.
[7] 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955).
[8] Internation Association of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958).
[9] International Union, United Automobile etc. Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).
[10] 356 U.S. 617, at 621, 78 S.Ct. 923, at 925.
[11] Lockridge v. Amalgamated Ass'n of St., El. Ry. & M.C. Employees, 84 Idaho 201, 208, 369 P.2d 1006 (1962).
[12] See Cox, Federalism in the Law of Labor Relations, 67 Harv.L.Rev. 1297 (1954).
[13] Compare International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958), and Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), with Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957).
[14] Cox, supra note 12, at 1315-1317.
[15] 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).
[16] 359 U.S. 236, at 242, 79 S.Ct. 773, at 778.
[17] 359 U.S. 236, at 241, 79 S.Ct. 773, at 777.
[18] 359 U.S. 236 at 241, 79 S.Ct. 773 at 777.
[19] See Currier, Defamation in Labor Disputes: Preemption and the New Federal Common Law, 53 Va.L.Rev. 1, 2, 7-14; Michelman, supra note 1, at 648.
[20] 359 U.S. 236 at 242, 79 S.Ct. 773 at 778.
[21] 359 U.S. 236 at 242-243, 244, 79 S.Ct. 773. The doctrine of primary jurisdiction, originally designed to protect the uniformity of Interstate Commerce Commission rules, has turned chiefly on the alleged expertness of federal administrative bodies in recent years. L. Jaffe, Judicial Control of Administrative Action 121-151 (1965).
[22] 359 U.S. 236 at 244, 79 S.Ct. 773 at 779.
[23] 359 U.S. 236 at 245, 79 S.Ct. 773 at 780.
[24] Currier, supra note 19, at 7-14; Michelman, supra note 1, at 648; Updegraff, Preemption, Predictability and Progress in Labor Law, 17 Hastings L.J. 473, 484-485.
[25] E.g., Marine Engineers Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962); Hanna Mining Co. v. Dist. 2, Marine Engineers Ben. Ass'n, 382 U.S. 181, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965).
[26] E.g., Cox's Food Center, Inc. v. Retail Clerks Union, Local No. 1653, 91 Idaho 274, 420 P.2d 645 (1966); Day v. Northwest Division 1055, 238 Or. 624, 389 P.2d 42 (1964); Fullerton v. International Sound Technicians, 194 Cal. App.2d 801, 15 Cal. Rptr. 451 (1961); and cases cited in Currier, supra note 19, at 2 n. 7.
[27] Local 100 of United Ass'n of Journeymen and Apprentices v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963).
[28] Local No. 207, Internation Ass'n of Bridge, etc., Iron Workers v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963).
[29] 373 U.S. 690 at 697, 83 S.Ct. 1423 at 1427.
[30] San Diego Building Trades Council v. Garmon, 359 U.S. 236, 242, 79 S.Ct. 773, 778, 3 L.Ed.2d 775 (1959).